HAYES v. KERR et al.

(Supreme Court, Appellate Division, First Department. June 11, 1897.)

1. WILLS — RIGHTS OF DEVISEES — ELECTION TO TAKE PROPERTY INSTEAD OF PROCEEDS.

Testator devised an hotel, and the furniture, fixtures, etc., thereof, to his wife and his son in equal shares, and directed the executors to sell the property and divide the proceeds equally between the devisees; stating as a reason therefor that he did not wish his son to continue in, or be identified with, the hotel business. *Held*, that the direction to sell was not imperative, so that a failure to do so was a breach of duty by the executors; of which advantage could be taken by the devisees or their next of kin, but the devisees had the right to take the property devised instead of the proceeds.

2. RESCISSION OF DEEDS—CONFIDENTIAL RELATIONS BETWEEN GRANTOR AND GRANTEE.

In an action to set aside a deed to defendant on the ground that it was procured by improper means, it appeared that the grantor was about 84 years old and very illiterate; that she was the widow of defendant's father, who had devised to her the property conveyed to defendant; that she obtained all her legal advice from defendant's attorney; that she relied on defendant, who was one of the executors of his father's will, in the management of the estate; and that she was in partnership with defendant in conducting an hotel which had been devised to them by defendant's father. The deed sought to be set aside was procured by defendant's attorney under his instructions, as the result of representations that the estate owed defendant a large sum for services rendered to testator, that there was not enough personalty to pay certain annuities given by the will, and that defendant would pay the annuities and release his claim against the estate in consideration of the deed. The deficiency of personalty was not as great as was represented, and the agreement signed by defendant, under which the deed was executed, did not contain a promise by him to pay the annuities. The evidence did not show the value of the services rendered by

defendant, or that his father had ever agreed to pay him anything. *Held,* that the deed was properly set aside.

3. SAME—COMPETENCY OF GRANTOR.

A voluntary deed will be set aside at the instance of the heirs of the grantor where it appears that the grantor was 84 years old and very ill when it was executed; that she did not speak at the time, but signified her assent by nodding; that she had no legal adviser, and there is no evidence that she had ever directed the deed to be prepared, or as to who had it prepared.

4. JUDGMENT—COLLATERAL ATTACK—WANT OF JURISDICTION.

A judgment cannot be collaterally attacked by showing that there is a doubt about the jurisdiction, but the want of jurisdiction must be made to appear clearly by a fair preponderance of the evidence.

Ingraham and O'Brien, JJ., dissenting.

Appeal from special term, New York county.

Action by Emma Hayes against Leonard R. Kerr, individually and as executor of the will of Lawrence R. Kerr, and others, to construe the will of said decedent, and for other relief. From the decree entered on the decision of the court, defendant Leonard R. Kerr appeals. Modified.

Argued before RUMSEY, PATTERSON, O'BRIEN, INGRAHAM, and PARKER, JJ.

Charles A. Jackson, for appellant.

M. J. A. McCaffery, for respondents William and Ruth Jolly.

Peter B. Olney, guardian ad litem for defendants Eddy.

RUMSEY, J. Lawrence R. Kerr, of the city of New York, died in that city on the 7th day of December, 1888, leaving surviving him Mary R. Kerr, his wife; Leonard R. Kerr, his only son; and one daughter, Mrs. Mary O'Brien, who is now dead; John H. Eddy, Lawrence R. Eddy, and William C. Eddy, sons of Mrs. Sarah Eddy, deceased; and Walter Ashe, the son of Annie Ashe, another daughter. Mrs. Eddy and Mrs. Ashe, the daughters, had died before their father. Lawrence R. Kerr was the second husband of Mary Kerr, who, when she married him, had children. Emma Hayes is the granddaughter of Mrs. Kerr by one of her children by her former husband. So, also, are the defendants Heinaman and Jolly. At the time of his death, Lawrence R. Kerr was the owner of a considerable amount of real estate in this city, among which was an hotel known as the "Putnam House," situated on Fourth avenue. Used in connection with that hotel was a house known as "No. 105 East Twenty-Sixth Street." He owned several other houses, not necessary to mention in connection with this action. By his will, made in January, 1876, Lawrence R. Kerr divided his real estate among his children, leaving to each of them, except Leonard, a substantial amount, which need not here be specified. He devised to Mrs. Kerr, his wife, certain houses and lots and household furniture, and he also made her his residuary legatee. The specific devises to his wife were made and received by her in lieu of dower. He also directed that his executors should within three months after his decease purchase for each of his two sisters an annuity for a small amount, and directed that until the purchase had been made the amount of the annuity

should be paid to his sisters out of his general personal estate. He devised the Putnam House, with all that it contained, to his wife, Mary Kerr, and his son, Leonard R. Kerr, to be equally divided between them; and, as the litigation in this action very largely grows out of that devise, it will be referred to more particularly. It reads as follows:

"I give, devise, and bequeath the leasehold premises situate at and known as 'Numbers 363 and 365 Fourth Avenue,' and the house and premises, vested in me in fee, known as the 'Putnam House,' situate and known as 'Numbers 367 and 369 Fourth Avenue,' and also the furniture, stock, fixtures, wagons, and horses, and all the other personal property contained in the said premises 363 to 369 Fourth avenue, and belonging or appertaining thereto, or to the restaurant or hotel business carried on by me thereat, with the appurtenances belonging thereto, unto my said wife, Mary, and my son, Leonard R. Kerr, to be divided equally between them; and to that end, and also in furtherance of my wish that my son, Leonard, should not continue in or be identified with said restaurant or hotel business after my decease, I direct the said property so devised and bequeathed shall be sold as soon after my decease as my executors shall deem most beneficial to the interest therein of my said wife and son, with liberty to my executors to sell same at once, or to rent same for a period not exceeding five years, according as in their judgment as will be most advantageous to my said wife and said son, and, if the same be rented, then the net rental is to be equally divided between my wife and said Leonard; and when said property is sold, which I direct shall in any event be done within five years at latest from my decease, the proceeds of such sale shall be invested in United States government securities, and same divided equally between my said wife and said Leonard, to be theirs absolutely."

At the time of the death of Lawrence Kerr he lived in Fortieth street, in one of the houses which is devised to his wife; but soon after his death Mrs. Kerr came to live in the house on East Twenty-Sixth street, which was more agreeable to her than the house in Fortieth street after the death of her husband. About a month after the death of Lawrence Kerr, his executors went through the form of selling the property known as the "Putnam House," and everything contained in it, which was included in the clause of the will quoted above, to Mary R. Kerr and Lawrence Kerr, the son of Leonard Kerr; and Lawrence Kerr almost immediately afterwards transferred by conveyance and bill of sale to his father all the interest in the Putnam House and the personal property therein which the executors had sold to him. This took place in January, 1889. In March, 1889, Mrs. Kerr conveyed the house 105 East Twenty-Sixth street, which had passed to her under the residuary devise, to Leonard R. Kerr, by a deed reciting a consideration of $10,000. On the 31st day of March, 1891, Mrs. Kerr conveyed to Leonard R. Kerr her half of the Putnam House, by deed which confessedly was without consideration; and on the 9th day of September, 1891, she transferred all the personal property in the Putnam House and used in connection with it to her son by bill of sale reciting a consideration of one dollar. The Putnam House covered four lots of land, of which Lawrence R. Kerr owned two in fee. The other two he held upon a lease made by Robert B. Roosevelt for 20 years, which would expire on the 1st day of May, 1893. On the 16th of December, 1889, Leonard R. Kerr obtained from Mr. Roosevelt a lease of those two lots for 10 years from the 1st of May, 1893, to himself individually,

upon the same terms as the former lease.  Mrs. Kerr died on the 23d of September, 1891.  This action was brought by the plaintiff, as one of her next of kin and heirs at law, for the purpose of setting aside the several conveyances mentioned above, of procuring a judgment that the lease taken by Kerr from Roosevelt should be held by him in trust for the tenants in common of the Putnam House, and to set aside the accounting of the executors of Lawrence R. Kerr, which need not more particularly be referred to here, and for other relief. After the trial of the action a judgment was ordered for the plaintiff for substantially all the relief demanded in the complaint, and from that judgment this appeal is taken.

The first question which will be examined here involves the correctness of the conclusion of the learned justice at special term in setting aside the conveyances and bills of sale to Mrs. Kerr and Leonard of the property known as the "Putnam House."  The theory upon which that part of the judgment proceeded evidently was that it was the absolute duty of the executors under the will of Lawrence Kerr to sell that property, and to divide the proceeds between Mary Kerr and Leonard Kerr, pursuant to the provisions of that clause of the will which has been quoted above.  It seemed to have been thought by him not only that this direction to sell the Putnam House was imperative, but that a failure to so dispose of it involved a violation of their duties as executors, of which not only Mrs. Kerr, in her lifetime, but her next of kin after her death, could take advantage.  In this we do not agree.  The gift to Mrs. Kerr and Leonard of the Putnam House was absolute and complete.  There vested in them, as the result of it, a complete and perfect title, with the right to use and occupy those premises, subject simply to the power of sale and to rent which was given to the executors to exercise if they saw fit, and if it would be most advantageous to the devisees.  The sale, when made, was for the exclusive benefit of the two devisees.  The proceeds of it were to be divided between them, and no other persons had an interest in it.  They were so situated, therefore, that they might have bought the property, if they had seen fit, or if they had requested the executors not to exercise the power of sale, and advised them that they elected to take the property free from that power, this is one of those cases where the right to sell would have been taken away.  Prentice v. Janssen, 79 N. Y. 478.  As the sale would have been entirely for their benefit, it is clear that they had the right to waive the exercise of that power by the executors, or they had, if they saw fit, the right to procure the executors to exercise it precisely as it was exercised, and thus have the power of sale extinguished, and still leave them in possession of the property.  If that was done by their procurement and at their request, no one else had the right to complain; and, if they were satisfied with it, their next of kin are not now in a situation to open up the transaction. That they both were satisfied with it is made to appear by indisputable evidence.  In fact, no one pretends to dispute it.  The evidence is uncontradicted that Mrs. Kerr from the beginning said that she desired to keep the hotel so that she and Leonard might run it together.  She was fully advised of the steps which were to be

taken to bring about this pretended sale; she consented to it; she knew of it when it was done, and after it was done, and she made no complaint of it, but, from the time that it was done until the end of her life, she insisted that she was the owner of half of that property, and had a right to dispose of it as she saw fit. While she was a very old woman, yet there was no reason to doubt that she was fully aware of all that was done in regard to this matter, and it all had her hearty concurrence. For this reason we think that she, had she been living, would have been estopped from questioning the propriety of this sale, and that her next of kin are bound by the same estoppel. So much of the judgment as sets aside the conveyance by the executors to Mary Kerr and Lawrence Kerr of the Putnam House, and the bill of sale to them of the personal property therein, and the subsequent conveyance and bill of sale by Lawrence Kerr to Leonard Kerr of the same property, must be reversed; and, as to these transfers, they must be declared to be valid.

On the 11th day of January, 1889, and after these conveyances of the Putnam House had been completed, and the title to it had been transferred absolutely to Mary and Leonard Kerr, Mrs. Kerr made an agreement, in effect, that she would run the hotel with her son, Leonard R. Kerr, on equal terms; Leonard to have the entire management of it. This was done by a paper writing drawn by her grandson Lawrence Kerr, and executed by her on the day of its date. As to this transaction, we can see no possible impropriety in it on the part of anybody. It simply carried out the intention which Mrs. Kerr had expressed from the time of her husband's death. She evidently desired to continue in the control of the hotel. She wished to remain one of its owners. She had consented to the transaction by which that ownership was fixed in her and her son, and when that condition of affairs existed the agreement of January 11th was the most natural thing in the world, and, indeed, it was the only sensible agreement for her to make. At that time she was a woman of 82 or 84 years old. Her health, apparently, was good for a woman of her age, and there had been no perceptible failure in her mentally. She managed her own affairs to some extent, and was reasonably familiar with them. She was very illiterate, and while there are some papers in the case which bear her signature, supposed to have been made by herself, there is no proof by any one who ever saw her write that the signatures were made by her, nor does any witness testify that he ever saw her read or write a single word in her life. It is doubtful whether she was able to write at all. It certainly is a fact that every paper which is shown to be genuine upon this trial is signed by her with her mark. After her husband's death, Leonard Kerr, who was a man of mature age, was her chief and principal adviser. She had no attorney, and all her legal advice was obtained from the attorney of Leonard Kerr. While he was not in good health, and had suffered a stroke of paralysis many years before, it seems to be clear from the testimony that he was a man who knew something of business, and was considered by his mother and his family as competent to manage the affairs of this estate. After the agreement of January 11th, he not only occupied

towards his mother the relation of a son of mature years who was relied upon by an old lady to give her advice concerning her affairs, but he was the executor of her husband's estate, and as such controlled to a considerable extent property in which she was interested; and he was in addition to that her partner in the management of the hotel, which was by far the most valuable part of her property. Any conveyance therefore which he subsequently procured from her was presumably taken as the result of the influence which he was able to bring to bear upon her by reason of these relations. In examining the validity of the conveyances which were subsequently made, the existence of this relation between the parties is not only an important, but an essential fact, and it gives rise to the rule of law which has been laid down in such cases and which must be constantly referred to as the rule by which the validity of these conveyances is to be tested. There has never been any question as to what this rule is. Dealings between persons, one of whom is dependent upon and subject to the control of the other, resulting in a benefit conferred upon or an advantage gained by the one holding the dominant situation, naturally excite suspicion; and when that situation is shown, and it appears that the dominating party has received from the other a conveyance of property, either by a pretended sale or by gift taking effect at once, there is cast upon that party the burden of relieving himself from the suspicion thus engendered by showing that the transaction was free from fraud or undue influence; that the other party acted without restraint and under no coercion or pressure, direct or indirect, of the party benefited; that the gift, if there was a gift, was freely and deliberately made; that the whole transaction was fair and proper and that the grantor or giver was made aware of all the circumstances surrounding the parties and the property which was transferred, and any other circumstances which would enable him to act intelligently in regard to the matter and understand its effect, and that he had all the information which the receiving party had at his command, and also had such advice and counsel in regard to it as would enable him to understand the nature and effect of the transaction. In re Smith, 95 N. Y. 516; Boyd v. De La Montagnie, 73 N. Y. 498; Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430; In re Spratt's Will, 4 App. Div. 1, 38 N. Y. Supp. 329. In such a case as that, where the transaction is attacked, the person attacking is not called upon to make any further proof than to show the relation of the parties and the fact of the personal intervention of the one receiving the benefit, and it is then for him to establish all the facts necessary to make it certain that the trust and confidence had not been perverted or abused. In re Smith, supra. This is the rule applied to gifts or deeds inter vivos, taking effect presently; and it is not to be confounded with the rule in respect of wills, which is different, and does not impose upon the beneficiary so severe a burden. Bearing in mind this rule, we will now proceed to examine into the validity of the other transfers which were made between the parties, and which were vacated by this judgment.

On the 2d day of March, 1889, Mrs. Kerr was living in the house known as "105 East Twenty-Sixth street," to which she had removed at her own desire, and perhaps, also, upon the suggestion of her son, Leonard. This house, although a separate property, was near to, and used in connection with, the Putnam House. On the day last mentioned she conveyed this house to her son, Leonard, upon a consideration, mentioned in the deed, of $10,000. This conveyance, as it seems from the testimony, was procured by the attorney of her son, and under his instructions, and as the result of the representations made to her by him with regard to the condition of the estate. His testimony in regard to that matter was that he told her that the will provided that there should be annuities purchased for Ann Du Bois and Elizabeth Kerr, the sisters of her husband; one annuity was $300, and the other $360; that he was told that it would require about $8,000 to buy these annuities, and there was not enough personal property in the hands of the executors to do so. He also said that he was told that her husband had owed Leonard $3,000 for borrowed money, and that Leonard also had a claim for services at the hotel, for which his father had paid him nothing for a long time; and he told her, further, that there would not be money enough to settle all these things, and they would either have to mortgage or sell some property. She said she knew that Mr. Kerr had not paid Leonard, because he had taken so much money to build the hotel. The attorney said then that he told her that Leonard was willing to release all his claims and to pay the annuities, and to make up whatever was short on the accounting, as there would be something short even then. She said she did not want to sell the farm, and she finally said that she would deed over this house, 105 East Twenty-Sixth street, provided it could be used in connection with the hotel without any rent being charged for it so long as she lived, which was agreed to, and the attorney said he would prepare the deed. When the deed was taken to her, the attorney, in handing it to her for execution, said that it was the deed in accordance with her agreement with Leonard; that Leonard would take care of the annuities; that the estate would not have to buy them; that he would release his claim against the estate for borrowed money, and his claim for services, and would make up any deficiency for these annuities and other expenses, not exceeding $12,000. And he prepared a paper to that effect, and thereupon Mrs. Kerr executed the deed and delivered it. This is one of the deeds which is set aside by the judgment in this case. It was procured, undoubtedly, as the result of the representations made to her by the attorney, as stated above. These representations, although they were probably supposed to be true by the gentleman who made them, are to a considerable extent contradicted by the facts appearing in this case, and the contract with Leonard Kerr was not carried out by the agreement which is presented. So far from there having been a deficiency of personal assets to pay these annuities, it appears from the account of the executors, which was filed on the 30th day of April, 1891, that the annuities down to that time, which was more than two years after the execu-

tion of this deed, had been actually paid out of the personal estate, and that, excluding the personal property used in connection with the Putnam House, there was a surplus of personal estate after making all the payments with which the executors charged themselves in their accounts. The representations, therefore, made with regard to the annuities, were not in all respects accurate, because Leonard Kerr had not at that time taken upon himself the payment of the annuities. He never took upon himself the payment of them until after the accounts had been settled. There was not so great a deficiency as was stated to Mrs. Kerr to be likely to exist; and the agreement itself, which is put in evidence in the case, does not contain any promise on the part of Leonard Kerr to assume or pay the annuities, or any part of them, but simply to make good any insufficiency in the personal estate necessary to pay the debts of the intestate, exclusive of the claim which Leonard Kerr himself had. Nor is there sufficient proof in the case that there was any such sum due to Leonard Kerr as was represented. He makes no proof anywhere, although he was sworn himself upon that subject, of a contract between himself and his father by which any certain sum was to have been paid to him. He says that his father was accustomed to give him $2,000 about the 1st of January of each year, down to 1873; but he does not make any proof of the value of the services, or that there was any arrangement on the part of his father to pay him that sum or any other sum. He says, in addition, that his father gave him notes from time to time, but the amount of the notes, or when they were given, nowhere appears; and we are entirely in the dark as to the amount of money received by him from his father, or as to the amount of money that he ought to have had. There is nothing whatever to show that it was $30,000, or any other particular sum. So, with regard to the borrowed money, there was nothing but his own testimony to show that he had lent his father any amount of money. That testimony was incompetent, in the first place; but, taking it for all that it was worth, it was so meager and uncertain that it cannot safely be used for a conclusion that the facts stated in it were correct. There is no pretense that this property was transferred to Leonard Kerr by his mother as a gift, or that she intended that he should become possessed of it in any such way; and there is great doubt whether Mrs. Kerr did not feel compelled to convey it in spite of her desire not to, because there is evidence in the testimony of Mrs. Hayes that her mother told her when they were endeavoring to procure this deed that she was in a good deal of trouble; that they were bringing papers to her all the time to sign, and she did not know what she was signing, and it was worrying her all the time to death, and she wished she could have somebody that she could trust, so that she would not have so much trouble; that her son wanted the house in Twenty-Sixth street for back salary while he was working for his father; and that Mr. Wallace said they could not settle the business until she complied with that wish, and she was not going to do it. It is made to appear as a mere business transaction; and regarding it as such, in view of the relations of the parties, we cannot say that the learned

45 N.Y.S.—67

trial justice was wrong in holding that it was not sufficiently explained and supported by the person who received it. Mrs. Kerr does not seem to have been informed accurately, fully, and entirely of the condition of affairs which it was said made it necessary for this transfer to be made; and certainly some of the statements made to her were not correct, and the testimony in defense of the transaction does not come up to the requirements of the law.

But, viewed in another aspect, this transaction is still more open to objection. It is claimed on the part of the plaintiff that this was one step in the execution of a scheme already formed by Leonard Kerr, by which he should eventually become the owner of his mother's share of the Putnam House and all the property used in connection with it. The plaintiff says that this transfer was unnecessary, and that it was brought about by statements which, to say the least, were not entirely and fully true; and we have already suggested that this claim of the plaintiff is not wholly unfounded. He claims further that the steps taken later with regard to the Putnam House property by Leonard Kerr show that there was a scheme on his part to become the owner of that half of the property which belonged to his mother. It appears, and is not disputed, that, while Mrs. Kerr and her son were occupying this property as partners, Leonard Kerr procured to be taken to himself individually a renewal of the lease from Roosevelt of the two lots upon which part of the Putnam House stood, for 10 years from May 1, 1893, when the lease to Leonard Kerr would expire. When that lease was taken, which was on the 16th of December, 1889, Mrs. Kerr and Leonard were running the house in partnership, as has already appeared. It was the desire of both of them at that time that they should continue to own that property in common. Leonard Kerr claims that at that time he had never talked to his mother about transferring her half of it to him, and he had no reason to believe that she intended to do any such thing. There was no reason to suppose at that time that Mrs. Kerr was not likely to live beyond the time of the expiration of the lease to her husband, because, although she was quite aged, she was not at all feeble, and, so far as appears, was in good health mentally and physically. It is not claimed by any one that Mrs. Kerr was told by her son that he intended to take this lease to himself before it was taken, or afterwards that it was so taken; and, unexplained as the transaction is, it is difficult to understand it, unless it is, as claimed, one step in the execution of such a scheme as the plaintiff said existed in the mind of Leonard Kerr. It was a violation of Leonard Kerr's duty towards his partner to take the lease in that way, and as partner of his mother in running the house, and as joint tenant with her in the ownership of it, he was bound to take the renewal of the lease in the name of both of them; and, if he did not do so, he will be required to hold the lease which he did take as the trustee for his other tenants in common, and will not be permitted to take the sole benefit of it himself. Mitchell v. Reed, 61 N. Y. 123. It is suggested in explanation of this transaction that Leonard Kerr may not have been aware of the impropriety of taking this lease in this way, and thus

extinguishing the rights of his mother as partner in the leasehold property, or that, as the lease was to his father individually, he may have thought it was proper to take it to himself individually, or that he may have done it thoughtlessly. But the trouble with all these suggested explanations is that Leonard Kerr himself does not make them, and there is no inference of their existence to be found in the testimony. So far as he is concerned, he leaves the transaction, without mentioning it, to stand as the basis of inferences which are to be made and are made in regard to such transactions in other cases and between other people. By such inferences he must be judged here. It is not the duty of, nor is it permitted to, appellate courts, for the purpose of reversing a judgment, to depart from the natural inferences established by the evidence, or to draw other inferences based upon facts not established, and not found by the court below. This transaction is of considerable importance, not only as bearing upon the object with which Mrs. Kerr was induced to convey the Twenty-Sixth street property, but as showing an intention at the time in the mind of Leonard Kerr to become in some way the owner of the remainder of the property, or at least an expectation that he should become such owner, although he does not state, and practically denies, that at that time he had any reason for such expectation.

The next transaction between the parties which is the subject of investigation here took place on the 31st day of March, 1891. At that time Mrs. Kerr conveyed to her son, Leonard Kerr, her half of the Putnam House property, by a deed which was executed on that day, and recorded on the 25th of April, 1891. The conditions surrounding the execution of that deed require careful examination. Mrs. Kerr was then 84 years old. Down to within 10 days she had been in good health, and active and vigorous for a woman of her age. On the 21st of March she was attacked with a very serious illness, so that from the first her life was despaired of. The doctor visited her twice and three times a day, and he was thus visiting her at the time when this deed was executed, as is shown by his memoranda testified to when he was called as a witness for the defendant. No person is called as a witness who received any instructions for the drawing of this deed. No person is shown to have talked with Mrs. Kerr about it, except Leonard Kerr, who had some talk at a time during the illness, which he fixes as about the last of March, in which he says that he asked her what she was going to do with the hotel, and received for a reply that she would give it to nobody but him, whereupon he asked her if she would fix it up in a few days, and she said she would. This talk was had confessedly at the time when this woman was exceedingly sick of an illness which was expected to be fatal. The deed was executed, as is said, on the 31st of March, 1891. Mr. Alexander, the notary who took the acknowledgment, is dead, and could not be sworn as a witness. The other person present was Henry Foster, who was sent for to be present at the execution of the paper. He said that Mrs. Kerr was lying up in bed, or sitting up in bed; that she nodded to him when he came in, but said nothing; that Alexander read the paper to her, and when he had read it

through she nodded her head. She could not say anything, because she had her teeth out at the time, and as a matter of fact she did not say anything in words. That witness saw her make her mark right after the document was read to her. Although he heard it read, he himself evidently did not understand what it was, because he says it was a will or document. After the mark was made, the notary, as the witness says, asked her, was she satisfied? did she understand? and she nodded her head. She did not say anything in words. She did not say anything else, and that was all that happened, so far as he knows. He says, however, that Mr. Alexander signed it, and swore her to it, by which he probably means that he took the acknowledgment. There is no further testimony as to what occurred at that time. It is said on the part of the defendant that the fact that the deed was acknowledged by a notary affords a presumption, not only that it was properly executed, but that Mrs. Kerr understood what there was in it, and she did it intelligently and without any undue pressure having been put upon her. To this we cannot accede. Undoubtedly, when a notary takes an acknowledgment a presumption arises that there was a proper execution of the deed by a person who was competent to make one; but the presumption goes no further than that, and, in view of what we all must know as to the manner in which many notaries do their duties, that presumption is of very little weight. The plaintiff, in addition to standing upon the presumption arising from the relation between the parties, insists upon the following facts as tending to impeach this deed: Mrs. Kerr was then exceedingly sick. The testimony does not show that she gave any directions to anybody to prepare this paper, or by whose procurement it was prepared. It is said by one of the witnesses that before this time she had stated that she proposed to make no further transfers, that she would treat all her children alike, that she understood her son's motives, and that he would not get any more than what rightfully belonged to him. Whether that evidence is to be relied upon, may be doubtful, but it is presented by the plaintiff as a fact bearing upon the probability of the intelligent execution of this deed. Mrs. Kerr had many other descendants besides Leonard Kerr; some of them, the descendants of herself and Leonard Kerr's father. This property was devised to her absolutely, and she was at liberty to give it to whom she saw fit, and the plaintiff claims that there was no reason to suppose that she would give it to one person rather than to another. No consideration was paid for the property. In addition to this, the plaintiff relies strongly upon the fact that it appears that no conversation was had with Mrs. Kerr in relation to this gift to Leonard until she was lying weak and feeble in what was supposed to be her last illness, and that it was at that time the deed was procured to be made without furnishing to Mrs. Kerr any independent and disinterested counsel, who could explain to her the full effect of the transaction, and assure himself that she was acting intelligently, but it was brought about by the request of her son, and procured to be executed by a man who was a boarder in the hotel and intimately connected with her son's son, and in the absence of any attorney whom she could trust. On the other hand, the defendant insists that Leon

ard Kerr was her only son; that he had helped his father in the management of this hotel for many years, and had become peculiarly connected with it, to the exclusion of other people; that apparently he was his mother's favorite; that she particularly desired to have him engaged in the management of the hotel, and had always expressed a desire that he should manage it; that there was no reason why her children by a former husband should share in the property of Lawrence R. Kerr, and that she had other property of which they would receive a portion.   It appears, too, by the testimony of all the physicians, that, although Mrs. Kerr was physically sick, she was perfectly rational, and her mind was clear in every way.   The defendant further shows that Mrs. Kerr had always had the intention that Leonard should receive her share of the hotel, and he produces many witnesses who testify to her declarations that such should be the case. The plaintiff claims, however, that this testimony shows too much, because it appears that many of these declarations were made after she had apparently recovered from the illness of March, 1891, and during the summer of that year.   It is quite true that many witnesses testify that during that period of time she told them that she intended to give this property to Leonard, and not one witness testifies that during that summer she said a word about having executed the deed to him already; from which the plaintiff claims that Mrs. Kerr had no recollection or was not aware that she had up to that time made any deed of the property to her son Leonard.

This is substantially all the testimony bearing directly upon the validity of this deed.   It appears, however, that during the summer of 1891 the affairs of the hotel were conducted precisely as they had been before the deed was made.   Mrs. Kerr, having recovered from this illness, took the same interest in the affairs of the hotel that she had before, and, so far as her health permitted, gave the same attention to them as previously.   There was no outward change of title or possession, and no claim made on the part of Leonard, or suggestion on the part of Mrs. Kerr, that the title to this property had passed entirely to Leonard.   Everything stood in the same situation as before her illness, although the conveyance had been made to him of the real estate and the leasehold property, and he had become aware of it.   And yet, although there was no indication on the part of his mother of any intention to complete the gift to him by the transfer of the personal property in the hotel, which was absolutely essential to its usefulness as an hotel, he said nothing about it, and she took no steps to complete it.   This condition of affairs existed until the 9th of September, 1891.   During the summer Mrs. Kerr had entirely recovered from her illness of March.   In August, however, she was attacked with what subsequently proved to be her last illness, and of which she died on the 23d of September.   After she had been sick about a month she executed to Leonard a bill of sale of all the personal property in the hotel, and necessary to its use and management as such.   This bill of sale, also, was executed in the presence of Alexander and Foster, the same persons who were said to have been present when the deed of the hotel was made in the previous March.   But there is not one word of testi-

mony in the case, from the beginning to the end, as to the manner
or circumstances of its execution, nor one thing to show that Mrs.
Kerr at the time of executing it knew what was in it; that she had pre-
viously consulted anybody about it, or that she had any connection
with it except to put her mark upon it.   Alexander was dead; Foster
was asked nothing about it; and Mr. Adams, the attorney who pro-
duced it upon the trial, did not pretend to know anything about it.
This paper stands solely upon the transaction itself, and there is not
one word of testimony to sustain it from the beginning to the end
of the case.   The fact that Foster, who was present when this was
executed, was asked nothing about it, and that there is no attempt
to sustain it, is quite as remarkable as anything else in this remark-
able case.

   In addition to all the other facts that have been referred to, the
account of the executors must be spoken of, as perhaps giving some
intimation of the way in which this estate was managed, and the
amount of information received by Mrs. Kerr in regard to it from
time to time.   This account was filed in September, 1891, just about
the time that Mrs. Kerr was recovering from her serious illness of
that month.   While she was thus ill the account, apparently, was
taken to her for examination, although it is quite clear that she
was not at that time in any physical condition to examine intelli-
gently so long and complicated an account as this.   It was shown
to her first by Lawrence Kerr, the son of Leonard, who said that
she looked it over, or that he told her what was in it, and that she
expressed herself satisfied with it.   Mr. Adams, the attorney, also
went to her with the account, as he says, and talked it over with her.
It is rather remarkable that the only thing to which her attention
was attracted when she made the examination of the account with
Mr. Adams was the amount of the annuities; and although two years
before she had taken from Leonard an agreement to pay these an-
nuities, so that they should not be chargeable upon the personal
estate, and at this time her attention was expressly called to the
fact that these annuities had been paid out of the personal estate,
she makes no complaint of it, and says nothing about the violation
of Leonard's contract, but permits these annuities, to the amount
of something over $1,500, to be charged against the personal prop-
erty, when she knew that her son had agreed to take care of them
and to relieve the estate of her husband from the payment.   It is
fair to infer from this fact, to say the least, that her memory was
considerably at fault at this time, because, if she had remembered
the agreement between herself and her son, had through Mr. Adams,
that her son would take care of these annuities from March, 1889,
it is not likely at all that she would have consented that they should
be credited to the executors and charged against the body of the es-
tate.   Very great weight is to be attached to the undisputed facts
that not only was this account presented to this old woman, and she
was asked to pass it, at a time when she was confessedly very sick
and just recovering from a severe illness, but that each one of the
transactions of 1891 took place under precisely the same circum-
stances.   Nothing was ever said to her about giving this property to

her son, Leonard, as he expressly testifies, until this serious sickness in March, 1891, and the gift of the real estate took place during that sickness. But this left the transaction incomplete. She still retained the title to the personal property. Her son learned of this in April, when she was recovering. From that time until August he permitted the matter to stand, so far as appears, without saying one word to her on the subject, and there was no indication given of an intention to give him the personal property, or any effort to procure it, until she again became seriously sick and confined to her bed in her last illness, and then the transaction was completed. In the meantime, while she was well, we find that she never referred to the transaction, and gave no one of her friends any idea that she had given this property to her son, but continually spoke of her intention to do it in the future. These facts are quite suggestive, and they are not explained by any testimony offered on the part of the defendant. So, also, the fact that while she was so sick she was called upon to pass this account, in which she had great personal interest, and when it might just as well have been postponed until her return to health, if she did return to health, is to be considered as bearing upon all the transactions between this old woman and her son, and to some extent as giving color to the claim of the plaintiff in regard to them. This account confessedly put upon the estate the payment of these annuities which Leonard had agreed to pay, and it also imposed upon the estate the payment of large commissions for the purchase price of bonds which were alleged to have been received upon the pretended transfer of the Putnam House in January, 1889, and to have been turned over to Mrs. Kerr and Leonard, but which in fact were never received or never transferred, and for which in fact the executors were entitled to no commission whatever. It is unfortunate that this transaction was had at a time when this old woman was flat upon her back in bed, and confessedly not able to give any personal attention to the matter, and when no one was present before the surrogate to attend to her interests. In view of all these facts, we think that the conclusion reached by the special term, that these conveyances and this bill of sale were not shown by the defendant to be valid, was a proper one. It cannot be said that the transfer of March 31st was a gift causa mortis. There is no claim of that kind in the complaint, or on the part of the defendant; and, if there were, it cannot be sustained, because, while it was made when Mrs. Kerr was suffering from a very serious illness, there is no claim that it was made with a view to her death, and it is conceded that she did not die of the illness from which she then suffered, but she subsequently recovered, so that, if it were a deed causa mortis, it became void upon her recovery. Grymes v. Hone, 49 N. Y. 17, 20. As completed gifts between parties inter vivos, being intended to operate at once and finally, we think, upon all the facts, they cannot be sustained, and the judgment, so far as it set them aside, was correct.

So much of the judgment as decrees that the lease from Roosevelt to Leonard R. Kerr shall be held to have been taken by him

in trust for the owners of the Putnam House must be affirmed. Mit-
chell v. Reed, supra. But so much of the judgment as sets aside
the decree of the surrogate upon the accounting of the executors
of Lawrence R. Kerr is, we think, erroneous. Where a judgment
of a court of competent jurisdiction is attacked collaterally, it is
not sufficient to show that there is doubt about the jurisdiction, but
it must be made to appear clearly, by a fair preponderance of the
evidence, that no jurisdiction was acquired, and that the recitals to
that effect in the decree are false. Ferguson v. Crawford, 86 N. Y.
609. Nothing but satisfactory evidence in that regard will be re-
ceived. There was an entire lack of such evidence in this case.
There was direct proof that Mrs. Kerr was served with the citation
upon her upon this accounting; and while it was made to ap-
pear that the place of service was mistakenly stated, and there was
perhaps some doubt thrown upon the fact of service, yet it was not
disproved sufficiently to warrant the court in holding that the sur-
rogate's court did not acquire jurisdiction. The record of a court of
competent jurisdiction is of too much value to be destroyed by a
doubt or the breath of suspicion, but it can be overthrown only by
disproof of the facts which tend to prove that jurisdiction was ac-
quired. There was no such disproof of those facts here, and for that
reason so much of the judgment as sets aside that decree must also
be reversed.

The judgment must be modified as indicated in this opinion, and
as thus modified be affirmed, without costs to any party in this
court.

PATTERSON and PARKER, JJ., concur.

INGRAHAM, J. (dissenting). I am unable to concur in the af-
firmance of any part of this judgment. It seems to me that the
plaintiff has entirely failed to prove the cause of action alleged in
the complaint, and that the defendant Leonard R. Kerr has fairly
met the burden resting upon him. Considering the relation that
Leonard Kerr bore to his mother, the trust and confidence reposed
in him by her would throw upon him the burden of proving that a
deed of her interest in the property which they held in common,
executed by his mother to him, was her voluntary act and deed,
without being induced by any undue or improper influence; but this
is the extent of the burden that rests upon him. This property
belonged to the mother, was hers to do with as she wished, and
it is not surprising that she desired to give it to this son. The
question is, did she give it to him voluntarily, without compulsion
or improper inducement, and has the son satisfactorily established
that fact? Now, it is clear that if this instrument, which is a con-
veyance of the property from the mother to the son, had been a
will executed under the same circumstances as the deed was exe-
cuted, there would not be a moment's doubt as to its validity. She
or those who advised her chose to accomplish that result, not by a
will, but by a deed; and while, under the circumstances, I can see
no reason why a distinction should be made as to the proof neces-

sary to establish the deed from that to establish a will, we will consider that there is a distinction, and that because this is a deed the burden is upon the defendant Leonard Kerr to prove the fact that his mother voluntarily executed it.

The principal dispute of fact in this case is as to the inference to be drawn from facts proved. I shall not attempt to analyze this evidence, but shall only state some of the principal facts which are not disputed, and which seem to me to establish that this deed was voluntarily executed, and that no fraud or undue influence was used. The deed is presented, executed by Mrs. Kerr, duly acknowledged before a notary public, and duly recorded. The notary public, who was also a lawyer, and who prepared the instrument, is dead; and we are deprived of his statement as to the circumstances under which the deed was prepared, or his instructions from the grantor. Now, the burden of proving that this deed was executed by Mrs. Kerr to Leonard Kerr being upon Leonard Kerr, we have presented the deed so executed, and duly acknowledged before an officer authorized to take the acknowledgment of such instruments. We are bound to give due effect to this acknowledgment as proof of the execution of this instrument. The person making the acknowledgment is dead, and the person before whom the acknowledgment was made is dead. The instrument stands as a legally executed instrument. It is proof of itself, without corroboration, of the due execution of the instrument; and it is proof of the strongest character, not overcome by doubtful testimony, by a failure of recollection, nor by any evidence, but proof of the clearest and most cogent kind. The nature of such an instrument has lately been discussed by the court of appeals in the case of Bank v. McCarty, 149 N. Y. 80, 43 N. E. 431. In that case the court, after considering all of the authorities as to the effect of such a certificate, determined what effect a trial court was bound to give to it. It is there said:

"We think that, as between the parties, a certificate of acknowledgment, when read in evidence, makes out a prima facie case as strong as if the facts certified had been duly sworn to in open court by a witness, apparently disinterested and worthy of belief. The legal presumption of the proper performance of official duty by a public officer requires that this effect should be given it. While the evidence is not conclusive, as the statute provides that 'it may be rebutted and the effect thereof contested by a party affected thereby,' it is of such a character as, standing alone, to send a case to the jury, so that they may decide between the probative force of the certificate, supported by the presumption that it states the truth, on the one hand, and the evidence produced in rebuttal, whatever it may be, on the other."

Assuming, therefore, that the burden of proof is upon the defendant Leonard Kerr to prove that his mother executed this deed, giving to this certificate of acknowledgment this effect, the mere production of that certificate of acknowledgment proves that fact, subject to be rebutted by evidence tending to show that the deed was not duly executed by the grantor, and subject to be rebutted by evidence tending to show that this defendant Leonard Kerr, or some one else, had procured this execution by fraud, or had exercised over the grantor undue influence. Was there any such evidence? A careful examination of the testimony has satisfied me

that there is not the slightest scintilla of evidence to rebut this presumption of a proper execution of this deed by the grantor.

Leonard Kerr was called as a witness for the plaintiff, and was examined by her. From his testimony brought out upon that examination, it appears that, with the exception of an incidental conversation some time before this deed was executed, in which an arrangement about this co-partnership property was referred to, he had made no request of his mother about the conveyance of this property, and that he had no knowledge of the execution of the deed until about three weeks after it was executed. That testimony is not contradicted in the slightest degree by any evidence in the case. The execution of the deed, therefore, was not procured by Leonard Kerr, nor did he have anything to do with it. The gentleman who prepared the instrument, and before whom it was acknowledged, was a lawyer and a notary public, against whom there is no suspicion of improper conduct. He was an acquaintance of both Leonard Kerr and his mother. As before stated, he is dead, and there is no evidence as to the instructions given by Mrs. Kerr as to the preparation of this deed; but in the face of this testimony there can certainly be no presumption that it was prepared at the request of any one except the grantor, or that it was not executed by her with full knowledge of what it contained. There is also the uncontradicted evidence of one who was present at the execution of the deed, and who was a witness to it. He swears that it was read over to the grantor, that she acquiesced in it after it was so read to her, and that she herself made her mark upon the instrument and acknowledged it to the notary. That evidence is not disputed, and it is not claimed that at that time Leonard Kerr was present, or had any communication with the grantor upon the subject of this deed. We have also the evidence of those about Mrs. Kerr, apparently entirely disinterested, who stated that both before and after the execution of this instrument she stated that it was her intention to give this property and business to her son, Leonard. We have also the fact that, immediately upon Leonard's becoming acquainted with the execution of this deed, it was duly recorded in the register's office; thus notice of its execution being given, without any attempt of concealment, during the lifetime of his mother. So, if there had been any impropriety in its execution, a word from any of those interested would have enabled the mother to have taken the necessary steps to protect herself. Now, these facts that I have stated are proved either by witnesses called by the plaintiff, or by the uncontradicted testimony of persons apparently entirely disinterested. It is important in this connection to consider the probability of the grantor's wishing to make such a disposition of her property. She had received this half of the hotel property under the will of her husband, who was the father of Leonard Kerr, her only son. Her other children, who were the full sisters of Leonard Kerr, were all dead; leaving, however, some descendants. She had also the descendants of children by a former marriage, who were not connected at all with her husband from whom this property came. For many years Leonard had assisted his father

in carrying on the business, and in making it a profitable and valuable one. Her husband by his will had left one-half of the hotel property and business to his son, Leonard, and one-half to his widow, the grantor. None of her other children, so far as appears, had at all assisted in that business, or was familiar in any way with it. She had also inherited from her husband quite a large amount of other property, which, upon her death intestate, would be divided equally among her children. Can it be said to be unreasonable, or evidence of fraud or duress, that under the circumstances the mother should give this hotel and the business connected therewith to the son who had assisted in building up the business and making it valuable, who was familiar with it, and who could continue to conduct it profitably and well, rather than to allow it to be divided among all of her children, in which case a large proportion of it would go to those who were not at all connected with the one from whom she had received it? The fact that she considered it just that the son should have the other half of the hotel does not tend to prove that the deed was improperly obtained, as it possibly would in a case where a person who had executed a conveyance or will disinherited those who would be the natural object of her bounty, in favor of a stranger. Thus, we have, as tending to sustain this burden thrown upon the defendant Leonard Kerr, the due execution and acknowledgment of this instrument, which, as evidence, is of great weight,—at least as strong "as if the facts certified had been duly sworn to in open court by a witness apparently disinterested and worthy of belief." We have the corroborative evidence of a witness present when the deed was executed, uncontradicted. We have the uncontradicted evidence of a witness, made credible by the plaintiff herself, that the one to be benefited by the execution of the deed had no knowledge of its execution until three weeks after it was so executed; that then it was publicly recorded, notice being given to all of its execution, without one suspicion being brought forward against it during the lifetime of the grantor; and the fact that from the circumstances surrounding the property, and the method of its acquisition by the grantor, it was a most natural disposition to make of the property, coupled with a constant announcement by the grantor of her intention to make such a disposition of the property.

Now, what evidence has been adduced by the plaintiff to overcome the effect of this proof? Merely the evidence of children and grandchildren of the grantor, who would be interested in the enforcement of this judgment, of conversations with this old lady during the last few years of her life, which are of the most uncertain character, and which, even if true, would not at all contradict in any essential particular the evidence offered by the defendant, and the fact that the executors of her husband's will, of which the defendant was one, and the attorney that represented them, apparently have made some statements to the grantor as to the property left to her under that will which were not in all respects accurate. But it is not proved that Leonard Kerr had any knowledge of the transactions; that the executors or their attorney made any such statement to his mother; but, on the contrary, the evidence is that Leon-

ard Kerr left all of the business relating to his father's estate to two of the executors, who had particular knowledge of matters of that kind, and the attorney employed by the executors. There is also some criticism upon Leonard Kerr, as to his obtaining a lease of a portion of the premises in his own name instead of in the name of himself and his mother, who were then co-partners; but in the absence of any claim on the part of Leonard that he owned that independently of his mother, or that he intended to defraud her in obtaining such a lease, or to hold it as against her or the co-partnership of which she was a member, the mere fact of taking such a lease in his own name, under the circumstances, is certainly no evidence to show that this deed was not properly executed. Considering the age of his mother, the difficulty that she had in writing, and the fact that she was not in the habit of attending to business of this kind, it would not be at all unnatural for Leonard, one of the partners, to take the renewal lease in his own name, and thus avoid the necessity of disturbing his mother by requiring her to execute it. There certainly is nothing shown to justify a finding that he intended to take this renewal lease and hold it as against his mother, or those who would succeed to her interest. The court is unanimously of the opinion that the accounting cannot be set aside, that the conveyance of this hotel to Leonard Kerr and his mother by the executors was not wrongful, and that the hotel itself and business vested in the mother by the will, the execution of the power of sale not being necessary to make them the owners of this property. All of this transaction, therefore, as between the executors and the mother, relating to the execution of the power of sale, is quite immaterial in determining this question. It seems to me to throw no light upon the question as to whether or not this grantor knowingly executed this conveyance. There is certainly not the slightest evidence to show that the grantor was not at the time she executed both of these instruments of sound mind, and perfectly able to understand what she was doing; and I think the evidence is most conclusive that she did understand what she was doing, and voluntarily and intentionally conveyed this property to her son; that this deed was voluntarily and knowingly executed to carry into effect the intention of the grantor, and that upon the evidence any judgment setting it aside was unauthorized; that the facts relied upon in the prevailing opinion to show such fraud or undue influence do not really affect the question as to the execution of this instrument at all, and have no probative force to overcome the presumption attached to the acknowledgment of the instrument before the officers duly authorized to take such acknowledgment, and the strong and uncontradicted evidence that such an instrument was made as the free act and deed of the grantor. It is said that the grantor mentioned the fact that she was the owner of the property after the time this deed was executed, but the evidence as to these statements of hers is quite uncertain. The time is not accurately fixed, and it is all given by those who are interested parties in upholding this judgment. It would be quite easily understood that in consequence of this deed not having been delivered to the de-

fendant until some time after it was executed, and from Mrs. Kerr's ignorance as to the effect of such a conveyance, she might well have supposed that the deed was to take effect upon her death. Such statements, being admissions of a deceased person, are always received with great caution, and under the circumstances it seems to me that they should be allowed but little weight in considering the question of the execution of a deed; but this opinion is already too long, as I simply intended to state the result of my dissent, rather than to enter at large into the reasons. I think the judgment should be reversed and the complaint dismissed.

O'BRIEN, J., concurs.