In the Matter of the Estate of MARGARET DONNELLY, Deceased.

Surrogate's Court, Kings County, November 19, 1935.

*Ruston & Snyder* [*Milton B. Neuman* of counsel], for the petitioner.

*William A. O'Hare* [*Kenneth W. O'Hare* of counsel], for the respondent.

WINGATE, S. The present motion to dismiss this discovery proceeding at the close of the petitioner's case raises certain interesting questions regarding this distinctive proceeding of surrogate's practice.

The proceeding was initiated, under section 205 of the Surrogate's Court Act, by the administrator to examine three named persons in respect to the sum of $3,500, funds of the testatrix, which it was alleged came into the possession of the respondents within three months of the date of death of the intestate.

The respondents adopted the increasingly prevalent practice of appearing for examination, as directed, but failing to file any answer whatsoever. Had an answer been interposed admitting possession, and claiming title, the burden of proof would, of course, have shifted to the respondents to demonstrate the necessary elements of devolution of title to them. (*Matter of Housman*, 224 N. Y. 525, 526, 527; *Matter of Davis*, 128 Misc. 622, 623; affd., 222 App. Div. 846; *Matter of Booth*, 224 id. 363, 365; *Matter of Calen*, 142 Misc. 363, 365; *Matter of Arthur*, 148 id. 269, 272; *Matter of Wanner*, 146 id. 722, 725.)

Prior to the amendment of the law, when the surrogate was debarred from acting where a claim of title was interposed (*Matter of Hyams*, 237 N. Y. 211, 216, 217), it was, in substance, determined that upon default in answer the proceeding continued as an examination only (*Matter of Lowen*, 95 Misc. 421, 423, 424; affd., 175 App. Div. 895; see, also, *Matter of Arthur*, 148 Misc. 269, 271, 272), but with the amendment of section 206 by chapter 100 of the Laws of 1924, this situation was altered, and if it appears from the testimony adduced in the proceeding " that the petitioner is entitled to the possession of the property, the decree shall direct delivery thereof to him," and this, whether " the person directed to appear submits an answer * * * or shall make default in answer."

It is accordingly obvious that the change in the law has very closely amalgamated the procedure on discovery in the Surrogate's Court to that of replevin in the Supreme Court. (*Matter of Blair*, 151 Misc. 192, 193; revd. on other grounds, 242 App. Div. 689; *Matter of Enright*, 149 Misc. 353, 355; *Matter of Hagan*, 157 id. 378.)

When, therefore, no answer is interposed, the practical effect is precisely the same as if the respondent had entered a general denial, and the burden is imposed on the petitioner of making a

*prima facie* demonstration that he, in his representative capacity, has title and the right to the immediate possession of the property involved. (*Matter of Buckler,* 227 App. Div. 146, 147; *Matter of Canfield,* 176 id. 554, 556; *Matter of Massey,* 143 Misc. 794, 795; *Matter of Glasgow,* 121 id. 613, 614; *Matter of Tipple,* 118 id. 430, 431; *Matter of Bunt,* 96 id. 114, 117.)

Where, therefore, as in the case at bar, no evidence other than that adduced on behalf of the petitioner has been adduced, the determination of the controversy resolves itself solely into one of whether the facts shown, plus the inferences naturally deducible therefrom, demonstrate his title and right to immediate possession, and the motion for a dismissal at the close of his case is similar in nature to a demurrer to the evidence under the old practice.

The facts thus demonstrated for present purposes are that the decedent, who died on February 27, 1935, at the age of approximately seventy years, had, in the course of her life as a domestic, accumulated approximately $11,000, which was deposited in three bank accounts. She was unmarried, her nearest kin being two nephews, James Lavin and James Walsh, and two grandnephews, Adrian Hughes and Hillary Hughes. Her last employment was in 1930, after which time she lived partly with these relatives or their connections, and partly with strangers.

Her relations with her relatives were not made to appear, except that it was testified that on certain occasions her grandnephew, Hillary Hughes, accompanied her to one of her banks.

She went to live at the home of her grandnephew Adrian Hughes on the 25th or 26th of November, 1934, and while there was under medical care for a heart ailment and had a nurse. On December twelfth she signed a draft on her account in the South Brooklyn Savings Bank for the sum of $3,500, payable to Elaine Burke Hughes, who appears to have been the wife of the grandnephew with whom she was living. This draft bore a certificate by her physician that she " is of sound and disposing mind and capable of understanding the nature of said transaction." This draft was cashed by the payee and $3,000 of its amount found its way in equal parts into the possession of her grandnephews Adrian Hughes and Hillary Hughes, Elaine Burke Hughes retaining the third part.

Decedent's physician testified that she was of sound and disposing mind at all times up to her death, which occurred two months and a half to the day after this transaction was consummated. An officer of the bank testified to personal acquaintance with her up to approximately a month prior to the date of the draft and stated his impression that she was perfectly normal except for weakness of

age and illness and seemed fully capable of attending to her own affairs.

This is the evidence upon which the court is asked by the petitioner to determine that a *prima facie* demonstration has been made that he has title to, and immediate right to possession of, the $3,500 obtained by Elaine Burke Hughes on the draft of December 12, 1934.

The reliance of the petitioner is placed upon the doctrine of constructive fraud and he cites as persuasive authority the words of Judge ANDREWS in *Matter of Smith* (95 N. Y. 516, at p. 522) as follows: " Undue influence, which is a species of fraud, when relied upon to annul a transaction *inter partes*, or a testamentary disposition, must be proved, and cannot be presumed. But the relation in which the parties to a transaction stand to each other, is often a material circumstance and may of itself in some cases be sufficient to raise a presumption of its existence. Transactions between guardian and ward, attorney and client, trustee and *cestui que trust*, or persons one of whom is dependent upon and subject to the control of the other, are illustrations of this doctrine. Dealings between parties thus situated, resulting in a benefit conferred upon, or an advantage gained by the one holding the dominanting situation, naturally excite suspicion, and when the situation is shown, then there is cast upon the party claiming the benefit or advantage, the burden of relieving himself from the suspicion thus engendered, and of showing either by direct proof or by circumstances that the transaction was free from fraud or undue influence, and that the other party acted without restraint and under no coercion, or any pressure direct or indirect, of the party benefited. This rule does not proceed upon a presumption of the invalidity of the particular transaction, without proof. The proof is made in the first instance when the relation and the personal intervention of the party claiming the benefit, is shown. The law is not so impracticable as to refuse to take notice of the influence of greed and selfishness upon human conduct, and in the case supposed, it wisely interposes by adjusting the quality and measure of proof to the circumstances, to protect the weaker party and, as far as may be, to make it certain that trust and confidence have not been perverted or abused."

The rules thus stated are perfectly good law today, and indeed were so long before this pronouncement was made. The principles in question were established in England prior to the middle of the eighteenth century and were enunciated by the Court of Appeals approximately twenty years prior to the date of the *Smith* decision, in *Nesbit* v. *Lockman* (34 N. Y. 167, 169). (See, also, *Cowee* v. *Cornell*, 75 id. 91, 99.)

The limitations of the doctrine are, however, inherent in its very statement. It applies only to those instances in which the existence of fiduciary relations between the parties has been demonstrated. Such fiduciary relationship must be shown to have been in existence before a burden of going forward with proof of a negative is imposed upon the one receiving the benefit. The existence of the relationship is, therefore, the crux of the entire question of the applicability of the rule.

In those cases in which it has been demonstrated that one of the legally recognized fiduciary relationship existed, such as parent and child (*Barnard* v. *Gantz*, 140 N. Y. 249; *Allen* v. *La Vaud*, 213 id. 322; *Hayes* v. *Kerr*, 19 App. Div. 91), attorney and client (*Matter of Smith*, 95 N. Y. 516; *Matter of Putnam*, 257 id. 140; *Matter of Gallup*, 43 App. Div. 437; *Matter of Rintelin*, 77 id. 142; *Evans* v. *Trimble*, 169 id. 363), trustee and *cestui que trust* (*People's Trust Co.* v. *Harman*, 43 App. Div. 348; *Gick* v. *Stumpf*, 126 id. 548) or guardian and ward (*Matter of Smith*, 95 N. Y. 516), and, perhaps, physician and patient (*Cowee* v. *Cornell*, 75 N. Y. 91, 100), the situation is akin to that in which the doctrine of *res ipsa loquitur* applies (VAN KIRK, J., dissenting opinion, in *Matter of Jones*, 199 App. Div. 426, 436), and the rule governs transactions *inter vivos* although its applicability to testamentary gifts has frequently been questioned. (*Matter of Kindberg*, 207 N. Y. 220, 228; *Matter of Marlor*, 121 App. Div. 398, 399; *Matter of McCarthy*, 141 id. 816, 818.)

Where, however, such recognized confidential relationship does not exist, the applicability of the principle is strictly conditioned on a preliminary demonstration that, as a matter of actual fact, the relations between the parties were such as to arouse and perpetuate a feeling of reliance on the part of the person whose property is in question. (*Doheny* v. *Lacy*, 168 N. Y. 213; *Absalon* v. *Sickinger*, 102 App. Div. 383; *Thompson* v. *Peterson*, 152 id. 667; *Matter of Carter*, 199 id. 405; *Matter of Jones*, Id. 426; *Matter of Radley*, 228 id. 119.)

This distinction is pointed out with especial clarity by Judge GRAY, writing for the unanimous court in *Doheny* v. *Lacy* (168 N. Y. 213). After discussing the general rule and its applicability to such inherently confidential relations as trustee and *cestui que trust* and attorney and client, he says (at p. 222): " The presumption is one born of a relation of parties, which would create a situation of more or less dependence by one upon the other (*Smith* v. *Kay*, 7 H. L. Cas. 771). While in the relations instanced this rule is generally applied, it is, also, extended to other relations of trust, confidence, or inequality; but its application will then demand some previous proof of the trust and confidence, or of the superiority on one side

and of the weakness on the other. The law will not presume it from the ordinary relations between persons, in the business world, or in the family connection. The question as to parties so situated is a question of fact dependent upon the circumstances in each case." (See, also, *First National Bank* v. *Wright*, 207 App. Div. 521, 527.)

Since, under this authoritative pronouncement, the question of the applicability of the rule depends wholly on the factual situation which is shown to have existed, it is obvious that, absent one of the conventional fiduciary relationships, decisions based on peculiar states of fact are unimportant in a determination of whether trust and confidence were reposed, since in no two cases will the facts be the same.

In the case at bar none of the conventional types of fiduciary relationship existed. The question is, therefore, whether the record demonstrates actual proof of trust and confidence or of outstanding superiority on the one side and weakness on the other.

Of any especial trust and confidence even remotely akin to the relationship of *cestui que trust* and trustee, there is not a scintilla of evidence. The relationship of the decedent to Adrian and Elaine is wholly undisclosed except that the former was a grandnephew. The only additional demonstration respecting Hillary is that on certain occasions he accompanied the decedent to the bank where she apparently transacted her own business without his aid or advice.

On the issue of superiority and weakness, four salient facts appear. About a month previous to the transaction in question she did independent business with the officer of the bank who considered her fully competent to manage her own affairs. On the date in question her own physician gave a similar verdict respecting her condition, and two and a half months later she was apparently sufficiently a mistress of her own destiny to remove from the residence of her grandnephews and to take up a new abode. Finally, this was not a case of kidnap or forcible retainer by persons seeking to profit from her accumulated funds. There is no intimation that she did not come to them voluntarily or that she did not leave as soon as her inclinations dictated, and during the entire period of her sojourn she had with her an entirely independent third party in the person of her nurse who was presumably an insulator between her and any undue influence of these respondents.

In the opinion of the court, therefore, the record wholly fails in the preliminary showing requisite to cast upon the respondents the onerous burden of demonstrating a negative.

The proceeding is, accordingly, dismissed.

Enter decree on notice.