In the Matter of the Estate of MARY S. FARRELL (Sometimes Known as MARY L. FARRELL), Deceased.

Surrogate's Court, Monroe County, October 6, 1941:

*G. J. Skivington*, for the administratrix.

*K. B. Keating*, for the Union Trust Company.

*C. F. Bown*, special guardian, for the incompetent.

FEELY, S.  On January 5, 1928, the decedent, who was then in her eighty-sixth year and living at 86 York street, Rochester, N. Y., had two deposits in her own name alone in a local trust company — one a checking account in which there was a balance of twenty-four dollars at the time of her death, and a larger amount in a special deposit.  On January 5, 1928, there lived with the decedent at the address aforesaid a younger lady, then between thirty and thirty-five years of age, named Madeline O'Connor, who was not related by blood to the decedent.

On January 5, 1928, the larger or special deposit was closed by the withdrawal of $1,356.01, all of which on the same day, in the same bank, was transferred to a new account to the credit of the younger lady " in trust for " the decedent.  Since then this trust account has been reduced by withdrawals; and at the time of trial its balance was $1,197.65.  Meantime only interest has been added to this trust account.

Nine months after this trust deposit had been made, the decedent died on October 7, 1928, intestate; and just one month later the " trustee," having become incompetent, was committed to the local hospital on November 6, 1928, and is still confined there.

The administratrix of the decedent, on behalf of herself and of three other nieces and two nephews, began this proceeding against the incompetent and the trust company for the discovery of information and the delivery of the trust deposit to her as being allegedly the property of her intestate.  The respondent bank put in an answer denying any knowledge or information sufficient to form a belief.  Neither the bank nor the special guardian offered any evidence.  The special guardian submitted to the court that, under the ruling in *Matter of Massey* (143 Misc. 794), the petitioner had not made out a *prima facie* case.

The ruling last mentioned, which the same court followed in *Matter of Donnelly* (157 Misc. 319), is that owing to the peculiar wording of section 206 of the Surrogate's Court Act, the respondent's failure to file an answer has the same result as if a general denial had been put in; and thus the burden is placed upon the

petitioning administratrix of making a *prima facie* demonstration that in her representative capacity she has title and the right to immediate possession of the property involved.

Although she cannot rely upon the default in pleading as an admission of the truth of the allegations of her petition, so as to entitle her to judgment without proof, still she is entitled to the same favorable construction that the general rule on a motion for nonsuit concedes to the party having the affirmative. Circumstantial evidence is usually all there is to rely upon; and the test of it is whether this evidence in each particular case is such as to afford a possible basis for a reasonable inference that the intention was to create a trust for the " beneficiary," rather than merely to set up the appearance of one for the convenience or personal benefit of the depositor " trustee " himself.

Here the money in question was originally the sole property of the decedent. She was well on in years; and not in good health; and at a time only nine months before her death she placed her deposits in the hands of the younger woman who occupied the same house with her. The younger woman was a non-relative, and not under any natural duty to care for the ailing, aged woman. The latter's combined deposits were none too large to provide for her support and care during the last months of her life, and to bury her. These two deposits apparently were her only means of support. Both deposits together did not exceed the sum of $1,410.89 at the time the larger was transferred by the bank into the trust deposit account.

This younger woman in accepting the old lady's money expressly acknowledged to third persons, who made corresponding entry in the ledger of the bank, that the money was in her hands " in trust for " the one from whom she had received it. While this form of deposit, alone and by itself, may not " authorize an affirmative finding " (*Beaver* v. *Beaver*, 117 N. Y. 421) that the deposit was made with the intent to create a real trust, still it is manifestly " consistent with an intent on the part of the depositor to give the money to the other " (Id.); and where the money was not, in the first place, the money of the " trustee," but that of the " beneficiary," the acknowledgment of trust is more consistent with an intention to create a true trust than it is with an intent merely to set up a bit of mere planning, or of camouflage for the personal benefit of the " trustee;" rather, it indicates an intention to serve the convenience of the beneficiary.

After the larger deposit had been transferred in trust, the decedent's needs required her both to continue to draw upon her checking account, that stood in her name alone, and also to have with-

drawals made on the trust account. In the last nine months of decedent's life, from the creation of this trust, the checking account was reduced from $54.88 to $24, and the trust account from $1,356.01 to $974.08.

The decedent's own checks, and those of the trustee, passed from the trust company that honored them, after payment, into the hands of the trustee, who probably also had cashed the individual checks; and at some time not shown herein, those canceled vouchers presumably came into the home where the two women were living. Even if it be assumed the canceled vouchers came into that house after the death of the aged woman, still the latter could not have been ignorant of the source from which came the moneys represented by them, for that was all she had been living upon; and she could not have been living riotously, with the trustee, on the combined withdrawals made during those nine months, which were about $413.81 — or a little less than $46 per month on the average. Out of the trust account the only withdrawals made totaled $381.93; and these were made between January, 1928, and mid-July next. They were made regularly on the middle and end day of each month, except the end of July; and while not always in exactly the same amount, these two withdrawals per month were similar in amount month for month, and averaged sixty dollars per month. No withdrawals were made after mid-July, 1928, during the six or seven weeks that the decedent beneficiary lived; nor were any withdrawals made by the trustee during the thirty days after the deceased beneficiary's death, at the end of which the trustee was committed to the State hospital.

The regularity above described indicates the withdrawals were made to meet fixed periodic charges; but the proof does not definitely connect them with rent. Decedent lived and died in the home of her sister, who was probably nearly as old as was decedent herself. They both lived at 86 York street, on a rental basis; for soon after the death of decedent the sister and the trustee moved to another house, where the bank books and papers of the decedent were found after her death. A large part of the forty-six dollars per month seems to have been used for the board and lodging of the decedent, and possibly that of the trustee as well.

Two or three years before this trust account was opened the decedent had made no withdrawals whatever from the deposit that went into this trust fund in January, 1928. Up to the time the trust account was opened, decedent apparently had some other source of income. The evidence is that she had been employed at housework. At the time of the opening of the trust

account some change had taken place in her health or income that made it necessary to begin drawing on her deposits, through the trust that was then set up. The death certificate shows she had never married; and that she was attended by Dr. McNamara from April 8, 1928, until her death in October following. The cause of her death was myocarditis.

After her death, the trustee did not draw any of this fund to pay for decedent's funeral. A sister of decedent paid fifty dollars on that account, which has not yet been fully paid to the funeral director. The trustee did not do or say anything tending to show the deposit then belonged to herself. Possibly, she was then incompetent, for her commitment followed within thirty days.

Aside from the inference that can be drawn from the mere form of the trust deposit, we must consider also its source and the course of conduct of these parties after it was set up, to be further indications that there never was any intention on the part of either lady of making the trustee the owner of the fund upon the death of the beneficiary. This trust was set up merely for the convenience of the ailing, aged woman, who was no longer able to go to the bank. The younger woman, in her thirties, was merely a messenger. The pass books and the canceled vouchers were not found in the exclusive possession of the trustee after the death of the beneficiary; but they were from the inception of the trust in the house where both the trustee and the beneficiary lived together. There is no evidence decedent made a gift of any sort, nor a delivery of symbols to effectuate a gift or payment.

Had the fund originally been the property of the trustee, then the death of the beneficiary before the death of the depositor who created the trust, might lead to the inference that the trust had died with the beneficiary. (*Matter of Duffy*, 127 App. Div. 74.)

This decedent, Mary L. Farrell, had created this trust with her own money for her own benefit alone; and thereby had an absolute right to revoke the trust at any time, on her wish alone, under section 23 of the Personal Property Law. There is no evidence of any irrevocable arrangement of any sort having been made for the benefit of the " trustee," Madeline O'Connor.

The same factual setting is found in *Matter of Woltman* (120 App. Div. 798), where the bank account stood in the name of an incompetent in trust for a beneficiary who had died. The court denied a motion to determine the right of the incompetent's committee to possession of the bank book as against the executor of the beneficiary where the executor was in possession of the pass book, and answered that the moneys were in fact deposited by the beneficiary and not by the incompetent. The parties were rele-

gated to litigate the question in issue by action. CLARKE, J., there wrote, as to *Matter of Totten* (179 N. Y. 112) and *Garvey* v. *Clifford* (114 App. Div. 193) as follows:

" Both of those cases proceeded upon the assumption that the money deposited at the time of the deposit was the money of the depositor, and laid stress upon the point that this fact, standing alone, did not establish an irrevocable trust; and, further, that there was an absence of proof of some unequivocal act or declaration, such as a delivery of the pass books or notice to the beneficiary, necessary to destroy the inference of a tentative trust.

" Nothing is alleged in the petition in the matter at bar save the title under which the accounts were opened. The answering affidavit sets up as matter of fact that the moneys deposited were at the time of deposit not the moneys of the depositor, but of Herman Woltman [the deceased beneficiary], and this, coupled with the possession of the bank books by Herman Woltman or his executor, would be evidence upon a trial of the issue tending to establish ownership in the fund in the decedent, and not in the incompetent. As possession of the bank books is such evidence of title, under the facts disclosed upon this record, it would be improper to change that possession *pendente lite.*"

In *Larkin* v. *Greenwich Savings Bank* (241 App. Div. 874) the " ostensible depositor " plaintiff was denied a summary judgment in her action for the fund against the executor of the " ostensible beneficiary," who had died. The executors had possession of the pass books; and the record made out a *prima facie* case of an absolute trust in favor of the deceased beneficiary, subject to such competent evidence as plaintiff might adduce on the trial of the terms of the trust if they militated against the decedent's right to the money on any theory which may arise on the evidence. The circumstances of the transactions between the parties may then shed light on its true nature and show to whom the money belongs. In making that motion for summary judgment, the plaintiff made no claim that the moneys thus deposited belonged to her.

In the case at bar the evidence on that point is clear; and with the conduct of the parties outlined above, makes out the *prima facie* showing required by the rule in *Matter of Massey* and *Matter of Donnelly* (*supra*). My conclusion is that it was not intended or agreed by and between the beneficiary and the trustee that the fund should ever become the property of the trustee individually; but that it should remain the property of the beneficiary; and that the trust was terminated by the death of the beneficiary; and that the administratrix of the beneficiary is entitled to possession

of this trust fund as part of the estate and assets of the deceased beneficiary.

In reaching that conclusion there has not been overlooked the ruling that where such a trust is opened by the depositor with his own money, and the beneficiary dies before the depositor dies, the trust does not mature, if the depositor has failed to complete the gift in his lifetime by acts sufficient to constitute a valid gift, or to show the trust had become irrevocable. (*Matter of Vaughan,* 145 Misc. 332; *Matter of United States Trust Co.,* 117 App. Div. 178; *Matter of Bulwinkle,* 107 id. 331; *Cunningham* v. *Davenport,* 147 N. Y. 43.) In *Jennings* v. *Hennessy* (26 Misc. 265) the depositor had delivered the book to the beneficiary, and made the trust irrevocable. In *Lee* v. *Kennedy* (25 Misc. 140) there was a question whether the deceased beneficiary had fulfilled a condition on which the so-called trust was created; and it also appeared there that some of her wages had been added to the deposit. A like commingling appeared in *Matter of Kive* (139 Misc. 273).

On notice settle and enter a decree in accord with this decision.